

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TARSHA E. CARROLL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04 C 3827 |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of | ) | Magistrate Judge Nan R. Nolan |
| the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tarsha E. Carroll ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g)

seeking review of the final decision of the Commissioner of Social Security ("Commissioner")

denying her application for Supplemental Security Income ("SSI") benefits under Title XVI of the

Social Security Act (the "Act"). 42 U.S.C. § 1381a. This matter is before the court on the parties'

cross-motions for summary judgment. The parties have consented to the jurisdiction of the United

States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the case is

remanded to the ALJ for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Plaintiff applied for SSI benefits on August 29, 2001, claiming that she became disabled on

November 20, 1994 due to a learning disability and a broken ankle.[1] (R. 48, 70-73.) The application

---

[1] Plaintiff's prior applications for SSI benefits (including an October 4, 1994 application
for child's SSI benefits filed on Plaintiff's behalf by her mother) were denied. (R. 20-21, 23-32,
37-40, 42-44, 67-69, 262-64, 267-70, 273-75.) The ALJ did not reopen any of Plaintiff's prior
applications (R. 15), and the parties agree that Plaintiff would only be eligible to receive SSI
(continued...)

1

was denied initially on March 7, 2002 and again on reconsideration on June 13, 2002. (R. 45-48, 51-54.) Plaintiff filed a timely request for an administrative hearing, which was held on August 20, 2003. Plaintiff appeared at the hearing without counsel and the Administrative Law Judge ("ALJ") properly advised her of her right to representation. Plaintiff stated that she wanted to represent herself, and the hearing proceeded as scheduled. Plaintiff does not challenge this issue here. (R. 387-90, Pl.'s Mem. at 1 n.1.)

On January 30, 2004, the ALJ denied Plaintiff's claim for SSI. The ALJ found that Plaintiff's ankle injury, borderline intellectual functioning, and depression did not constitute disabilities under the Social Security Regulations. (R. 18.) The ALJ also concluded that Plaintiff's nonexertional limitations do not allow her to perform the full range of sedentary work, but that "there are a significant number of jobs in the national economy which she could perform." (*Id.*) On April 30, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 7-10.)

## BACKGROUND FACTS

### I.    MEDICAL EVIDENCE

#### A.    Plaintiff's 1995 Ankle Injury and Mental Status at Age 15

Plaintiff, born March 23, 1979, was 24 years old at the time of the hearing and had five children ranging in age from one to nine. (R. 393-95.) In 1995, at the age of 15, she fell and fractured her right ankle. She was placed in a cast for a period of time but after it was removed, she experienced residual pain with both ambulation and weight bearing. (R. 178, 378.)

---

[1](...continued)
benefits as of the date of her August 29, 2001 application. (Pl.'s Mem. at 1 n.1, Def.'s Mem. at 1 n.1.) *See* 20 C.F.R. § 416.501.

On January 4, 1995, Dr. Russell L. Tracy, Ph.D., a consultative examiner, completed a psychological report and performed a mental status examination of Plaintiff. (R. 328-30.) At that time, Dr. Tracy administered the Wechsler Intelligence Scale for Children - III ("WISC-III"), a test which measures a child's intelligence quotient ("IQ"). (R. 328.) On the WISC-III, Plaintiff scored a verbal IQ of 55, a performance IQ of 54, and a full scale IQ of 50, which placed her in the moderately-to-severely mentally deficient range. (*Id.*) Dr. Tracy reported, however, that when Plaintiff took the WISC-III she did not seem to put forth her best effort, noting that her persistence was fair-to-poor on many of the test items. He also stated that Plaintiff tended to give up almost immediately without making any effort to formulate a response (or a better response) on many of the test items. (R. 329.) Dr. Tracy concluded that Plaintiff's test findings "must be viewed as a minimal estimate of [her] general intellectual ability," and indicated that her test results "were suppressed significantly by inadequate motivation." He recommended that she be "re-evaluated at such time when her testing motivation [was] adequate." (R. 329-30.)

Two days later, on January 6, 1995, Plaintiff was hospitalized after taking an overdose of sleeping pills. (R. 253-60, 331-74.) She indicated in her hospital admission history that she was not attempting suicide but, rather, trying to sleep, and that she did not know why she had taken so many pills. (R. 259.) Plaintiff subsequently underwent a psychiatric evaluation with Dr. J. Chen, M.D. on January 8, 1995. Dr. Chen diagnosed Plaintiff as suicidal and suffering from depression, and reported that she claimed to have been depressed since having her first baby, who was eleven months old at the time. Dr. Chen noted that Plaintiff's affect remained depressed, her attention span was short, and her concentration was also "affected." (R. 257.)

3

On January 13, 1995, Plaintiff underwent a consultative psychiatric evaluation with Dr. Lambros Chrones, M.D. (R. 375-77.) At that time, Plaintiff reported difficulty concentrating and low energy. She stated that she had impulsively taken sleeping pills the previous week in an effort to try to sleep due to feelings of depression, flu symptoms, a headache, and her baby crying. (R. 375.) On examination, Dr. Chrones noted that Plaintiff's mood was moderately to severely depressed and her affect was restricted. (R. 376.) Dr. Chrones diagnosed Plaintiff as having major depression (single episode, severe with post partum onset), a learning disorder not otherwise specified, possible mental retardation, and a history of an ankle fracture. (R. 377.) He further indicated that Plaintiff walked with a very slight limp due to her ankle fracture. (R. 376.)

On January 20, 1995, a state agency medical consultant evaluated the medical evidence in connection with Plaintiff's claim for child's benefits and determined that she was not disabled. (R. 316-19.) Approximately one year later, on February 20, 1996, Dr. Leonard R. Smith, M.D. performed a consultative examination of Plaintiff. (R. 380-84.) Plaintiff reported that she had experienced pain in her right ankle for one year as a result of the fracture she sustained in 1995. (R. 380.) An X-ray evaluation of the right ankle revealed a healed fracture of the lateral malleolus[2] which was in good position, though Dr. Smith did observe thickening of the ankle and tenderness in the medial aspect of the ankle. (*Id.*) Dr. Smith concluded that Plaintiff could perform work-related activities because her fracture had "healed uneventfully" such that she had normal ability to bear weight and required no assistive devices. (R. 381, 382-84.) On May 22, 1995, a second state agency

---

[2]     "Malleolus" is a rounded protuberance on the side of the ankle. (*See* http://www.bartleby.com/61/29/m0062950.html.)

medical consultant evaluated the medical evidence in connection with Plaintiff's claim for child's benefits and again determined that she was not disabled at that time. (R. 324-27.)

## B.     Plaintiff's Mental and Physical Status at Age 19

On April 21, 1998, Plaintiff, who was nineteen years old at the time, underwent additional testing with Bridget Stafford, Ph.D. (R. 245.) Dr. Stafford administered the Wechsler Adult Intelligence Scale III ("WAIS-III"), a test which measures an adult's IQ. The test showed that Plaintiff had a verbal IQ score of 76, a performance IQ score of 69, and a full scale IQ score of 70.[3] Dr. Stafford noted that Plaintiff's full scale IQ score of 70 fell "in the borderline range of intellectual functioning." (*Id.*)

Dr. Angelito A. Bernardo, M.D., conducted an internal medicine consultative examination of Plaintiff on August 28, 1999. (R. 176-82.) Plaintiff reported that she had fallen and broken her right ankle in 1995, and that it continued to cause her pain. (R. 176.) She stated that she could only stand for about thirty minutes to one hour; walk for about four to five blocks; and climb two to three flights of stairs. (*Id.*) Plaintiff indicated that she took Tylenol and Motrin for the pain, which was worse when she walked and put weight on her right ankle. (R. 177.) On examination, Dr. Bernardo noted mild swelling on Plaintiff's right lower extremity and tenderness on the medial malleolar area. (R. 178.) He found that Plaintiff had a decreased range of motion on her right ankle joint on flexion (twenty degrees) and on extension (ten degrees). (R. 178, 180.) Dr. Bernardo indicated that Plaintiff had mild difficulty walking fifty feet, walking on her tiptoes and heels, squatting, rising, and tandem walking. (R. 178.) Dr. Bernardo's diagnostic impression was that Plaintiff had a history of a right

---

[3]While the report from Dr. Stafford is not in the administrative record, her report is referred to in another report (i.e., Psychiatric Review Technique form dated February 20, 2002). (R. 233-46.)

ankle fracture with residual pain. (*Id.*) An X-ray evaluation of Plaintiff's right ankle taken the same day as Dr. Bernardo's examination showed "normal osseous and joint structures with no definite evidence of fracture, dislocation or major joint pathology." The X-ray further revealed that "[t]he joint spaces [were] well maintained." (R. 182.)

Also on August 28, 1999, Plaintiff underwent a consultative psychiatric evaluation with Dr. Ricardo Espaillat, M.D. (R. 183-86.) Plaintiff reported that she had a history of a learning disorder that made it difficult for her to obtain jobs, concentrate and focus on tasks, and made her angry and depressed. (R. 183.) Dr. Espaillat noted that a psychiatric evaluation performed in May of 1998 indicated that Plaintiff had borderline intellectual functioning. (*Id.*) On mental status examination, Dr. Espaillat found that Plaintiff's affect was appropriate, her speech was clear and coherent, her thought processes were very organized, and her recent and remote memory were intact. (R. 184-85.) Dr. Espaillat diagnosed Plaintiff as having, among other things, a learning disability not otherwise specified, dysthymic (depressive) disorder by history, borderline intellectual functioning with an IQ score of 70, a history of a right ankle fracture, and a Global Assessment of Functioning ("GAF") score of 65 to 70.[4] (R. 186.)

A few weeks later, on September 15, 1999, Dr. Jerrold Heinrich, Ph.D. reviewed Plaintiff's records and completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment. (R. 187-99.) Dr. Heinrich opined that Plaintiff met the part "A" criteria of Social

---

[4]GAF measures an individual's overall level of psychological, social, and occupational functioning. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (rev. 4th ed. 2000) ("*DSM-IV-TR*"). A GAF score in the range of 61 to 70 generally indicates an individual with "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

Security Listings 12.02 and 12.05 because she had a learning disorder not otherwise specified (under Listing 12.02) and borderline intellectual functioning (under Listing 12.05). (R. 189, 191.) He determined that she was slightly restricted in her activities of daily living, had slight difficulties in maintaining social functioning, and was moderately limited in her ability to maintain attention and concentration for extended periods of time. Dr. Heinrich also found that Plaintiff often had deficiencies in concentration, persistence, or pace, which resulted in her failure to complete tasks in a timely manner. (R. 194, 196.) He indicated that Plaintiff had a history of academic learning disabilities and borderline intellectual functioning, but that neither her cognitive functioning nor her adaptive behavior was consistent with mental retardation. (R. 198.) Dr. Heinrich determined that Plaintiff could follow some detailed instructions, but that she needed a simple repetitive work setting to help her stay focused on tasks. (*Id.*) He indicated that Plaintiff's social skills were functional, that she could adapt adequately to daily changes, and that she could do two-to-four step tasks. (*Id.*)

The next day, on September 16, 1999, Dr. Frank B. Norbury, M.D., a state agency physician, reviewed Plaintiff's medical record and completed a Physical Residual Functional Capacity Assessment. (R. 200-07.) He opined that Plaintiff was limited to occasional climbing (i.e., ramps, stairs, ladders, ropes and scaffolds), crouching, and crawling as a result of her 1995 right ankle fracture. (R. 202, 207.) Dr. Norbury noted that Plaintiff continued to experience pain in her right ankle, especially in cold weather, and that she had swelling and tenderness in that area. (R. 207.) On December 17, 1999, another state agency physician, Dr. Henry S. Bernet, M.D., reviewed Plaintiff's record and affirmed Dr. Norbury's physical assessment. (R. 200.) On December 20, 1999, state agency reviewers Bronwyn E. Rains, M.A. and Dr. Carl Hermsmeyer, Ph.D. concurred in Dr. Heinrich's September 15, 1999 assessment of Plaintiff's mental condition. (R. 187, 198.)

7

## C.    Plaintiff's Mental and Physical Status at Age 22

Plaintiff next underwent a medical assessment on January 8, 2002 when Dr. G.S. Chadha, M.D., performed an internal medicine consultative examination. (R. 225-32.) At that time, Plaintiff reported that she continued to experience pain in her right ankle after walking three to four blocks and climbing a set of stairs, and that she took over-the-counter medicine for relief. (R. 225-26.) Plaintiff also stated that she had a learning disability which caused her to be frustrated and depressed. (R. 226.) On examination, Dr. Chadha found that Plaintiff's right ankle movements were normal, that she had minimal tenderness on the medial malleolus, and that she was able to walk unassisted. (R. 227.) He noted that Plaintiff was able to walk on tiptoes and stand on her heels, but that tandem walking made her somewhat unsteady. (*Id.*) Dr. Chadha concluded that Plaintiff experienced pain in her right ankle after walking three to four blocks and climbing a set of stairs, and that she had a learning disability "by history." (R. 228.) An X-ray of Plaintiff's right ankle taken the next day showed "minimal cortical irregularity of the distal shaft" and no acute fracture. (R. 232.)

On February 20, 2002, Dr. Myrna G. Capati, M.D., a state agency physician, reviewed Plaintiff's records and completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment. (R. 233-50.) At that time, Dr. Capati reported that Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 247.) She further indicated that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods of time; to perform activities within a schedule; to maintain regular attendance; and to be punctual within customary tolerances. (*Id.*) Dr. Capati considered Plaintiff moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and in her ability to perform at a consistent pace

8

without an unreasonable number (and length) of rest periods. (R. 248.) She further reported that Plaintiff was moderately limited in her ability to accept instructions; to respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting extreme behavior. (*Id.*) Dr. Capati concluded that Plaintiff would be capable of performing very simple tasks in a work environment where her physical limitations were taken into consideration. (R. 249.)

## II.    PLAINTIFF'S TESTIMONY

At the hearing before the ALJ, Plaintiff testified that she was in special education classes for reading and math from fourth grade through eighth grade, and that she completed the eighth grade but did not finish ninth grade.[5] (R. 395-96, 398.) Plaintiff acknowledged that she was able to read a daily newspaper, but stated that she had difficulty understanding some of its contents and focused primarily on job advertisements and the horoscope section. (R. 396-97, 401-03.) Plaintiff also testified that she could perform simple math calculations and write, but that she needed assistance in filling out a job application. (R. 396, 400, 403-06.) She believes that her difficulty with reading comprehension has limited her ability to work. (R. 400-01, 406.)

Plaintiff worked as an "auditor" for an unidentified employer in 1997, which required her to count items in the store and input the information into a handheld computer device. (R. 397-98.) She held that job for only two weeks because her employer told her that she was not catching on to the proper use of the handheld device or performing the work correctly, and that she was working too slowly. (R. 398, 405.) Plaintiff also worked at United Parcel Service ("UPS") for about one month

---

[5]Plaintiff has a learning disability and would have been eligible for special education services in high school, if she would have continued her high school education. (R. 291, 295.)

stacking boxes, a position that required constant standing.[6] (R. 399.) Plaintiff testified that as a result of a sprained ankle she sustained during that time, the constant standing caused her to experience a lot of pain on the job and precluded her from performing the work. (*Id.*) She stated, without explanation, that her ankle improved but that she did not return to UPS. (R. 399-400.)

Plaintiff testified that due to her ankle problems, she could only walk for about two or three blocks before her ankle would start aching and throbbing. (R. 406.) She indicated that she could walk and stand for about three hours in an eight-hour time period and had no problems sitting. (R. 406-08.) She took over-the-counter ibuprofen for ankle pain and did not seek medical treatment on a regular basis, aside from her gynecologist. (R. 410.) Plaintiff stated that she was able to perform household chores, including laundry, dusting, and mopping and sweeping the floor. (R. 408.) In a November 22, 2001 Activities of Daily Living Questionnaire, Plaintiff reported that she was also able to prepare meals, clean, iron, and make repairs, though cleaning and cooking were sometimes difficult because they required her to stand. (R. 125.) Plaintiff acknowledged being physically and mentally able to drive a motor vehicle, though her driver's license was suspended due to unpaid tickets. (R. 395.)

## III.   VERTIS CARROLL'S TESTIMONY

Plaintiff's mother, Vertis Carroll, testified that her daughter had difficulty understanding what she read and attended special education classes while she was in school.[7] (R. 414.) She stated that her daughter was able to understand some of what she read in the newspaper; however, she was

---

[6]The record does not reflect when Plaintiff held the UPS position.

[7]In a November 14, 1994 Questionnaire for Children Claiming SSI Benefits, Mrs. Carroll reported that her daughter received counseling and tutoring in reading and math beginning in the fifth grade. (R. 304.)

not able to understand large words.[8] (R. 417.) In Mrs. Carroll's view, her daughter was disabled due to "a problem with her mind" resulting, in part, from a motor vehicle accident Mrs. Carroll had when she was five months pregnant with her daughter. (R. 417-18.)

Mrs. Carroll stated that her daughter and her daughter's boyfriend took care of their five children and shared responsibility for the household chores, though the boyfriend did not live with Plaintiff. (R. 415-16, 418-19.) Mrs. Carroll indicated that her daughter was impatient, had a short-temper, and got into disagreements with family members.[9] (R. 419.) Mrs. Carroll further testified that, as a result of her daughter's right ankle fracture, she could not walk very far and could only stand for about two hours. (R. 416-17.)

## IV. VOCATIONAL EXPERT'S TESTIMONY

Vocational expert Gleann Kehr (the "VE") testified that Plaintiff had not performed her previous jobs long enough for them to be considered past relevant work under the Social Security Regulations. (R. 423.) The ALJ asked the VE whether there were any jobs available for a hypothetical 18-year-old individual with an eighth grade education (special education) who was functionally literate, not restricted in lifting and carrying, able to walk and stand a maximum of three hours in an eight-hour workday, and limited to simple repetitive tasks of a two-step operation. (R. 423.) The VE identified 6,000 machine operator jobs, 4,000 assembly jobs, and 4,000 packaging jobs available to such an individual. (R. 424.)

---

[8]In a May 8, 1995 Child Development Questionnaire, Mrs. Carroll similarly indicated that her daughter could not report accurately what she read in a newspaper or magazine article because she had trouble understanding some of the words. (R. 320.)

[9]In the May 8, 1995 Child Development Questionnaire, Mrs. Carroll similarly reported that her daughter argued with her teachers, and that if her daughter's peers upset her, she would argue and physically fight with them. (R. 320-21.)

The ALJ next varied the hypothetical by adding that the individual could not work in proximity to more than three people, and could have only minimal contact with them and no contact with the public. (*Id.*) The VE indicated that of the previously-identified jobs, the number available would be reduced by two-thirds or 66 percent. (R. 424-25.) In a third alteration of the hypothetical, the ALJ asked the VE how the job base would be affected if such an individual could only maintain concentration, persistence, and pace for 80 percent of the workday. (R. 425.) The VE responded that anytime an individual can sustain concentration less than 85 percent of the time, all work is precluded. The VE further noted that the manufacturing jobs he identified in the first two scenarios required sustained concentration of about 90 percent. Thus, there would be no jobs available to the individual described in this last hypothetical. (R. 425.)

## V.    THE ALJ'S DECISION

The ALJ found that Plaintiff suffered from three severe impairments: a cortical irregularity of the distal shaft of the right ankle, borderline intellectual functioning, and depression. (R. 15, 18.) The ALJ concluded, however, that these impairments, either singly or in combination, did not meet or equal any impairments listed in the Social Security Regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4. (R. 18.) As a result, the ALJ assessed Plaintiff's residual functional capacity ("RFC") to perform work despite her limitations. (R. 15-17.) The ALJ concluded that Plaintiff's nonexertional limitations rendered her unable to perform the full range of sedentary work, but that she had the RFC to perform sedentary work "at simple and repetitive tasks of two-step operation, working in proximity to no more than four people." (R. 18.)

The ALJ found that Plaintiff had no past relevant work, noting that she had not engaged in substantial gainful activity since August 29, 2001. Nor had Plaintiff acquired any work skills which

12

were transferrable to either skilled or semi-skilled work functions. (*Id.*) In addition, Plaintiff had a limited education and was, at the age of 24, considered a younger individual under 20 C.F.R. §416.963. (*Id.*) Relying on Rule 201.24 of Table No. 1 of the Medical-Vocational Guidelines, as supplemented by the VE's testimony, the ALJ found that notwithstanding Plaintiff's nonexertional limitations, she could perform a significant number of jobs that existed in the national economy, including 4,000 machine operator jobs, 2,666 assembler jobs, and 2,666 packaging jobs. (R. 17-18.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. In reaching this conclusion, the ALJ discounted Plaintiff's allegations of disabling limitations, noting that she took only over-the-counter medication for ankle pain and was able to read, write, care for her personal needs, and perform daily chores. (R. 16, 18.)

## DISCUSSION

### I.     STANDARD OF REVIEW

Section 405(g) provides, in pertinent part, that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Stevenson v. Chater,* 105 F.3d 1151, 1153 (7th Cir. 1997). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). The court may not "substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in [the] evidence, or deciding questions of credibility." *Estok v. Apfel,* 152 F.3d 636, 638 (7th Cir. 1998). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is disabled, the Commissioner has responsibility for resolving those conflicts. *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of

13

law, however, are not entitled to such deference. *Id.* Therefore, "if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings." *Id.*

## II.     STATUTORY AND REGULATORY FRAMEWORK

Under the Act, a claimant is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 416.905(a); *see also Jones v. Shalala,* 10 F.3d 522, 523-24 (7th Cir. 1993). To satisfy this definition, a claimant must have a severe impairment that renders her unable to do her past relevant work or any other substantial gainful work that exists in the national economy. *See* 20 C.F.R § 416.905(a).

In determining whether a claimant is disabled, the ALJ follows a five-step analysis outlined in 20 C.F.R. § 416.920(a)-(f): (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Stein v. Sullivan,* 892 F.2d 43, 44 n.1 (7th Cir. 1989); *see also Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). A claimant will automatically be found disabled if she makes the requisite showing at steps one through three. *Henderson ex rel. Henderson v. Apfel,* 179 F.3d 507, 512 n.3 (7th Cir. 1999); *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir. 1995). If the claimant is unable to satisfy step three, she must then show that she is unable to perform her prior job. *Henderson,* 179 F.3d at 512 n.3. If she makes this showing, the burden then shifts to the Commissioner to show that the claimant has the

14

ability to engage in other work existing in significant numbers in the national economy. *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

## III. ANALYSIS

### A. The ALJ's Finding at Step 3

Plaintiff claims that the Commissioner's decision denying her benefits should be reversed and/or remanded because the ALJ erroneously failed to consider whether she met the requirements of Listing 12.05(C) for mental retardation. (Pl.'s Mem. at 8-9, Pl.'s Reply at 3-7.) Plaintiff notes that the ALJ misstated her IQ as 77, when it was actually only 70. (Pl.'s Mem. at 8.) Plaintiff points out that Listing12.05(C) provides in relevant part:

> 12.05 *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> * * * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05(C) (2005).

Plaintiff insists that there is objective medical evidence in the record to support a finding that she meets Listing 12.05(C) because she has (a) a full scale IQ score of 70 and a performance IQ score of 69, based on testing when she was nineteen years old; and (b) a physical impairment (residual pain from her right ankle fracture) that imposes additional and significant work-related limitations of function (limited sedentary work). (Pl.'s Mem. at 8-9.)

The Commissioner does not dispute that the ALJ misstated Plaintiff's IQ score. Rather, the

Commissioner claims that the error is harmless because there is no evidence in the record to suggest

that Plaintiff meets the diagnostic description of Listing 12.05. (Def.'s Mem. at 9-10.) The

Commissioner points out that in order to meet Listing 12.05(C), Plaintiff must satisfy the diagnostic

description in the introductory paragraph of the listing as set forth in section 12.00(A) of the

regulations. (*Id.* at 9.) Section 12.00(A) provides in relevant part:

> Listing 12.05 contains an introductory paragraph with the diagnostic description for
> mental retardation. It also contains four sets of criteria (paragraphs A through D). If
> your impairment satisfies the diagnostic description in the introductory paragraph and
> any one of the four sets of criteria, we will find that your impairment meets the
> listing. 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00(A) (2005).

The Commissioner notes that the introductory paragraph of Listing12.05 states that mental

retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive

functioning which are initially manifested during the developmental period before age twenty-two.

(Def.'s Mem. at 9.) In the Commissioner's view, the ALJ could have reasonably determined that

Plaintiff did not meet the diagnostic definition of Listing 12.05 because (1) she was not diagnosed

as mentally retarded by any of the medical professionals who evaluated her, and (2) the evidence

showed that she did not have the required deficits in adaptive functioning. (*Id.* at 10-11.)

As a threshold matter, the court finds that to the extent the ALJ never considered or discussed

Listing 12.05(C), the Commissioner's arguments on this issue cannot be considered here. It is well-

established that the Commissioner is precluded from defending an ALJ's decision on grounds that

the ALJ did not himself articulate. *See Securities and Exchange Comm 'n v. Chenery Corp.,* 318 U.S.

80, 94 (1943) (the court's review of an administrative decision is limited to the grounds provided

by the agency); *Mendez v. Barnhart,* 439 F.3d 360, 362 (7th Cir. 2006) ("In defending the

16

administrative law judge's decision on a ground that he himself did not mention, the government violates the *Chenery* principle."); *Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir. 2003) ("general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ"); *Steele v. Barnhart,* 290 F.3d 936, 941 (7th Cir. 2002) ("But regardless [of] whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and [we] confine our review to the reasons supplied by the ALJ.") Significantly, the ALJ did not provide any basis for rejecting Dr. Stafford's finding that Plaintiff had a full scale IQ score of 70. (R. 245.)

Even assuming that the Commissioner's arguments regarding Listing 12.05 could be considered here, they arguably do not support the ALJ's decision in any event. First, the evidence in the record clearly establishes that Plaintiff's mental deficits initially manifested before the age of 22. (R. 245.) In addition, though only one medical professional diagnosed Plaintiff with possible mental retardation (R. 377), "[g]enerally, an IQ of 70 is considered just at the borderline of mental retardation." *Mendez,* 439 F.3d at 361; *see also DSM-IV-TR* at 49, 740 (an IQ score of 70, or below, is indicative of mental retardation). Plaintiff's performance IQ score of 69 and full scale IQ score of 70 place her intellectual functioning at the borderline of mental retardation, which would appear to satisfy not only the diagnostic definition of Listing 12.05, but also the first prong of Listing 12.05(C)

(a claimant must have "[a] valid verbal, performance, or full scale IQ of 60 through 70").[10] *See* 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05(C).

The Commissioner argues that Plaintiff does not possess the requisite deficits in adaptive functioning as required by Listing 12.05. (Def.'s Mem. at 10-11.) The Commissioner notes that the diagnostic criteria for mental retardation include an individual who possesses "[c]oncurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *DSM-IV-TR* at 49. Adaptive functioning, moreover, "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." *Id.* at 42. The Commissioner claims that Plaintiff does not have deficits in adaptive functioning because she is able to perform household chores, including cooking, cleaning, doing laundry, shopping for groceries, and caring for her five children.[11] (Def.'s Mem. at 10-11.)

Contrary to the Commissioner's assertion, there is evidence in the record to support Plaintiff's contention that she does have difficulty in adaptive functioning. Specifically, Plaintiff (1)

---

[10]Plaintiff had a verbal IQ score of 76, a performance IQ score of 69, and a full scale IQ score of 70. (R. 245.) "In cases where more than one IQ is customarily derived from the test administered, i.e., where verbal, performance, and full scale IQs are provided as on the WAIS, the lowest of these is used in conjunction with 12.05." *Maggard v. Apfel,* 167 F.3d 376, 380 (7th Cir. 1999) (quoting 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(D)).

[11]The court notes Mrs. Carroll's testimony that her daughter and her daughter's boyfriend took care of their children and shared responsibility for the household chores. (R. 415-16, 418-19.)

only completed the eighth grade and required special education services while attending school (R. 291, 295, 304, 395-96, 398); (2) had difficulty with reading comprehension and writing (R. 320, 400-06); (3) lost a job due to her inability to perform the basic job requirements (R. 397-98, 405); and (4) had problems getting along with family members, teachers, and peers. (R. 320-21, 419.) The Seventh Circuit has repeatedly warned against placing undue weight on a claimant's ability to perform household activities when assessing a claimant's ability to engage in work-related activities. *See e.g., Mendez*, 439 F.3d at 362 ("We have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home.")

In addition, there is evidence in the record that Plaintiff has a physical impairment which could impose an "additional and significant" work-related limitation; namely, residual pain from a right ankle fracture which limits Plaintiff's ability to stand and walk.[12] (R. 18, 176-78, 180, 207, 225-26, 228, 378, 380.) Plaintiff testified that due to her ankle problems, she could only walk for about two or three blocks before her ankle would start aching and throbbing, and she could only walk and stand for about three hours in an eight-hour time period. (R. 406-08.) The ALJ found that Plaintiff had a severe cortical irregularity of the distal shaft of the right ankle and limited her to those jobs

---

[12]Section 12.00 equates "additional and significant" with "severe:"

> For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.*, is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe". . . , we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

involving sedentary work. (R. 18.) Plaintiff's ankle impairment may thus satisfy the second prong of Listing 12.05(C), requiring that a claimant have a physical (or other mental) impairment that imposes an "additional and significant" work-related limitation.[13] *See* 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05(C).

Given the evidence in the record regarding Plaintiff's intellectual functioning, the court finds that the ALJ erred in failing to discuss Listing 12.05(C) or to consider the evidence in light of that provision. The case is therefore remanded for specific findings at Step 3 concerning whether Plaintiff's mental and physical impairments satisfy Listing 12.05(C). *See e.g., Mendez,* 439 F.3d at 361-63 (case remanded where the ALJ failed to apply Listing 12.05(C) and erroneously stated that the claimant's IQ scores were at 70 or above); *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002) ("By failing to discuss the evidence in light of Listing 12.05's analytical framework, the ALJ has left this court with grave reservations as to whether his factual assessment addressed adequately the criteria of the listing"); *see also Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir. 2003); *Prak v. Chater,* 892 F. Supp. 1081, 1087 (N.D. Ill. 1995).

---

[13]It is worth noting that Plaintiff was also diagnosed with a learning disability. (R. 186, 189, 291, 295, 377.) "The Social Security Administration defines 'additional and significant limitation of function' to mean 'another distinct diagnosable impairment,' which may be a learning disability." *Hall ex rel. Lee v. Apfel,* 122 F. Supp. 2d 959, 966-67 (N.D. Ill. 2000) (citation omitted). In addition, the record establishes that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods of time (R. 196, 247), and that she often had deficiencies in concentration, persistence, or pace. (R. 194.) *See Hall,* 122 F. Supp. 2d at 967 ("A 'significant limitation' does not have to be at the 'marked' level, but only at the 'moderate' level.") Accordingly, Plaintiff's learning disability and/or concentration impairment may also satisfy the mental impairment prong of Listing 12.05(C).

**B.     The ALJ's Finding at Step 5**

Plaintiff next argues that the Commissioner's decision denying her benefits must be reversed and/or remanded because the ALJ erroneously found that she could perform the manufacturing jobs identified by the VE despite the limitations in her ability to concentrate. (Pl.'s Mem. at 9-11, Pl.'s Reply at 7-10.) Plaintiff notes that the manufacturing jobs required sustained concentration of about 90 percent and would not be available to an individual who could sustain concentration for less than 80 percent of a workday. (Pl.'s Mem. at 10, R. 425.) Plaintiff also stresses the VE's testimony that an individual who can sustain concentration less than 85 percent of the time would be precluded from performing all available work. (*Id.*) Plaintiff claims that there are no jobs available for her to perform given that she has moderate limitations in her ability to maintain attention and concentration for extended periods of time, and that she often has deficiencies in concentration, persistence, or pace. (Pl.'s Mem. at 10, R. 194, 196, 247.)

The Commissioner does not dispute Plaintiff's limitations in maintaining attention, concentration, persistence, or pace, but stresses that the state agency medical consultants nonetheless found Plaintiff capable of performing very simple tasks in a work environment where her physical limitations were taken into consideration – i.e., she could perform two-to-four step tasks. (Def.'s Mem. at 12-13, R. 198, 249.) In the Commissioner's view, the ALJ's RFC finding was consistent with the opinions rendered by the state agency medical consultants, and the ALJ justifiably relied on the VE's conclusions that there were jobs available to Plaintiff. (Def.'s Mem. at 13-14.)

The Court finds that there is an inconsistency in the ALJ's determination that Plaintiff could perform a variety of manufacturing jobs despite her inability to maintain attention and concentration. The VE testified that the jobs he identified require an ability to concentrate for approximately 90

21

percent of a workday. As noted, however, the record reflects that Plaintiff has "moderate" limitations in her ability to maintain attention and concentration for extended periods of time, and that she "often" has deficiencies in concentration, persistence, or pace. The ALJ failed to articulate his reasons for rejecting or discrediting the state agency medical consultants' opinions regarding Plaintiff's limitations in her ability to concentrate. Indeed, an individual who has, at a minimum, "moderate" and "often" limitations in concentration is arguably incapable of sustaining concentration for 90 percent of a workday. *See e.g., Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency, . . . , if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result"); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (quoting *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) ("We have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some minimal level his analysis of the evidence.'")); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) ("[A]n ALJ must 'minimally articulate his reasons for crediting or rejecting evidence of disability.'")) Thus, a remand on this issue is warranted as well.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [Doc. 30] is granted to the extent it requests a remand, but is otherwise denied. Defendant's motion for summary judgment [Doc. 31] is denied. The case is remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

ENTER:

*Nan R. Nolan*

NAN R. NOLAN
U.S. Magistrate Judge

Dated: May 15, 2006